MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Carmen C. and Juan R., Sr., biological parents of Juan Luis R., Jr., born March 1996. This case also addresses a motion to revoke the commitment and transfer guardianship of the child to the maternal grandmother, Zoriada C. Juan Luis R., Jr., has been in foster care since September 9, 1997. Carmen C. and Juan R., Sr., were duly served and notified of the pendency of the petition.
The termination petition, filed by the attorney for the child, alleges the statutory ground for the termination of Carmen's parental rights of failure to rehabilitate and the statutory grounds for the termination of Juan R., Sr.'s, parental rights of abandonment and no ongoing parent-child relationship. The petition, which was adopted by the Commissioner of the Department of Children and Families by motion to join as party-petitioner, was amended to add the ground against the mother of abandonment by motion granted on January 11, 2001.
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment to it. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901
(1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest.
Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904 aff'd 35 Conn. App. 276,278, 648 A.2d 881, cert. denied, 231 Conn. 915, 648 A.2d 151 (1994). For the reasons stated below, the court grants the petition to terminate the CT Page 8262 parental rights of Carmen C. and Juan R., Sr.
 I FACTUAL FINDINGS
At trial, DCF introduced nine documentary exhibits and the testimony of Waldemar Gracia, a substance abuse counselor for the Institute for Hispanic Families, Ngina Gibson, DCF social worker, Maria Isabelle-Perez, an employee for the Institute for Hispanic Families, and Janice Cirullo, a nurse practitioner. The attorney for the child introduced the testimony of Mary Lou Freitas, the foster mother. The mother introduced two documentary exhibits and the testimony of Zoriada Cobian, the maternal grandmother, Maria Diaz, a friend of the mother's, Marilyn Claudio, a case manager at the Family Life Education program as well as her own testimony.
The credible and relevant evidence offered at trial supports the findings of the following facts by clear and convincing evidence.
A. Procedural History
On September 9, 1997, a petition alleging that Juan was neglected was filed by DCF, along with a motion for an order of temporary custody, which the court granted ex parte and subsequently sustained at a hearing on September 18, 1997. Juan has remained in foster care since that time. On February 3, 1998, the court accepted a plea of nolo contendre by the mother and continued the matter until March 3, 1998 for a plea by the father and a possible disposition of the case. Written expectations were entered for Carmen and approved by the court.
On March 3, 1998, the court learned that the father was incarcerated in Puerto Rico and he was allowed to stand silent as to the adjudication which was entered finding that Juan was neglected. A commitment entered retroactive to the February 3, 1998 date for a one year period. (Keller, J.) No written expectations were entered for the father, Juan R., Sr. He did, however, offer his mother who resides in Puerto Rico as a placement resource.
On March 2, 1999, the court denied DCF's petition for extension of the child's commitment, noting that the commitment had expired on February 3, 1999. The court also denied DCF's request for an order of temporary custody to be granted at that hearing. DCF immediately invoked a 96 hour hold and on March 5, 1999, filed a petition alleging predictive neglect together with an order of temporary custody which the court granted exparte. The allegations of the petition were neglect in that the child CT Page 8263 would be abandoned, the child would be denied proper care and attention, the child would be permitted to live under circumstances or associations injurious to his well being and uncared for in that the child's home cannot provide the specialized care which the child requires.
At a contested hearing, the court sustained the order of temporary custody finding DCF had proven by a preponderance of the evidence that the child would be in immediate danger if returned to the mother's home. On August 16, 1999, the parties reached an agreement and Juan was again adjudicated uncared for and committed to DCF for a one year period. Written expectations were ordered by the court on that date. (Dyer, J.)
On March 1, 2000, DCF filed a motion for review of permanency plan and set forth a permanency plan of transfer of guardianship to the paternal grandmother, Milagros R., who resides in Puerto Rico. The permanency plan was not approved at the hearing held on March 2, 2000 after the child's attorney asked for more time to review the plan and after the maternal grandmother, Zoriada C. addressed the court stating she wanted to be considered as a possible placement resource.
At the second hearing on the motion for review of permanency plan, the commitment was extended but the court did not approve the permanency plan for transfer of guardianship to the paternal grandmother. After hearing, the court stated it would consider the possibility of two alternative permanency plans: (1) transfer of guardianship to the maternal grandmother or (2) filing of a petition for the termination of parental rights and adoption. (Keller, J.)
The mother did file a motion to revoke the commitment and transfer guardianship to Zoriada C., maternal grandmother and the attorney for the child filed a termination of parental rights petition, alleging against the mother the ground of failure to rehabilitate and against the father the grounds of abandonment and no ongoing parent-child relationship. General Statutes § 17a-112 (c). Both actions were consolidated. However, DCF filed a motion to join as party-petitioner and prosecute the petition for termination of parental rights at the trial. Also filed was a motion to amend the termination of parental rights petition adding the ground of abandonment as to the mother. Both motions were granted on January 11, 2001. (Swienton, J.) The trial commenced on February 5, 2001, and lasted three days.
B. Carmen C., Juan's mother
Carmen C., is a twenty-six year old mother of three children. She is the third born of four children to her own mother. She has a ninth grade education and does not have a history of stable employment. Carmen was CT Page 8264 residing in Puerto Rico when she gave birth to Juan R., Jr., and left him with the paternal grandmother and returned to Connecticut in July 1996. At some point, Juan joined his mother in Connecticut and in April 1997, a referral was made by the maternal grandmother that the mother had left Juan and her other child with her with no food, provisions or any indication as to when she would return. In July, 1997, another referral was made with allegations of physical abuse and neglect. Upon investigation, DCF found that Carmen was residing in a dirty house with a heroin addicted boyfriend with little to no provisions for her children.
Juan was committed to DCF on February 3, 1998, and the mother was issued specific steps for reunification. When the first extension of commitment was due, DCF failed to file it in a timely manner, and the commitment lapsed. Juan was never returned to his mother, and DCF sought and was granted an order of temporary custody ex parte. He was adjudicated for a second time on August 16, 1999 as uncared for in that he was homeless and specific steps for reunification were again issued to the mother. The court takes judicial notice of those expectations, which are as follows:
(1) Keep all appointment set by or with DCF.
(2) Keep whereabouts known to DCF.
 (3) Participate in parenting and individual counseling and make progress toward identified treatment goals.
 (4) Submit to substance abuse assessment and follows recommendations regarding treatment. Successfully complete substance abuse treatment including impatient treatment if necessary. Submit to random drug testing. No substance abuse.
 (5) Sign releases authorizing DCF to communicate with services providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings in court.
 (6) Secure and maintain adequate housing and legal income.
(7) No involvement with the criminal justice system.
(8) Immediately advise DCF of any changes in the composition of the household to ensure that the change does not compromise the health and safety of the child. CT Page 8265
 (9) Visit child as often as DCF permits and demonstrate appropriate parent/child interaction during visits.
Carmen was admitted into a substance abuse treatment program with the Institute for Hispanic Families on August 28, 1998. Because of her failure to attend the program, she was discharged on November 18, 1998. She was readmitted on October 27, 1999. Waldemar Gracia, a substance abuse counselor with the program, assigned her to the intensive outpatient program. Carmen was not a steady user of substances, and based upon the random urine screen performed, only tested positive for marijuana. The goal was to help her to decrease her use of marijuana and eventually refrain from use. In February, 2000, a random screen indicated a clean urine, but unfortunately she discontinued her participation in the program and was discharged. Although her use of marijuana was similar to moderate alcohol use, something prevented her from total abstinence.
Carmen was also referred to Catholic Family Services for parenting classes and visitation supervision. The initial referral to this program was in February, 1998. Juan at that time was identified as a special needs child and it was during Carmen's participation in this program that Juan was diagnosed with Angelman's Syndrome.[2] Carmen began the program very interested and enthusiastic about the visits with her son. She often commented about his appearance and would examine him for any marks or abrasions.
But her interaction with her son often consisted of play which was too rough for him and did not display an awareness for his needs. Her engagement fluctuated from extreme affection to rough play and inattentiveness. More importantly, Carmen was in denial about her son's condition, unable to acknowledge and meet his needs. After his diagnosis on October 13, 1998, Carmen began to cancel visits with Juan more frequently. Eventually she was discharged from the six month program and reunification was not viewed as in the best interest of the child. (DCF's Exhibit E)
Carmen was also referred to individual counseling. She requested the referral during her participation with the reunification program. She voiced concerns about her relationship with her mother. She did attend the first appointment but did not complete the counseling sessions.
After Carmen was discharged from the parenting and visitation program, the visitation schedule changed. From January 1999 until June 2000, out of 80 possible visits, Carmen attended 15 visits. Transportation did appear to be an issue, and DCF offered to transport Carmen to the foster home as long as she called ahead of time to verify that she would be able CT Page 8266 to attend the visit. From June 2000 to February 5, 2001, Carmen visited with her son on two occasions: one time in June 2000 when the foster parents transported Juan to the courthouse for a hearing and Carmen visited with him on that day, and the second time on January 26, 2001. About once a month Carmen telephoned the foster home to inquire about Juan. But the calls were not on a regular basis, even though the foster mother encouraged the contact. Carmen did not send him any cards or gifts on special occasions.
Carmen did take the initiative in March, 2000, and referred herself to the Family Life Education program. The curriculum for the program is parent education such as parenting skills, communication, parenting styles as well as anger management. She completed 21 sessions out of 6 possible group sessions and received a Certificate of Achievement for her participation. (Mother's Exhibit 2). Unfortunately, a component of the program is to have the child at the program in order to observe the parent/child interaction and provide guidance, education and support. Due to DCF's plan of transfer of guardianship and Carmen's own statements that she supported that plan, DCF did not investigate her participation and completion.
One wonders why Carmen took this step, yet failed to follow through on any other expectations, one as simple as visiting with Juan or regularly calling to inquire about him. She did bring her two daughters to the program, and possibly she believed she could benefit or perhaps Carmen finally clicked with someone or something that motivated her. Unfortunately for Juan it was too little too late.
During her own testimony, Carmen displayed no appreciation for the difficulty in caring for a child with such specialized needs. of her three children, not one of them is even in her own care.
C. Juan R., Sr., Juan's father
Juan R., Sr., was born and resides in Puerto Rico. He has had little to no involvement with his son. He began to use heroin at the age of fourteen and has been incarcerated in Puerto Rico for armed robbery and drug related charges. He resides with his mother who offered herself as a placement resource. The paternal grandmother has come to Connecticut on several occasions to visit with her grandson, however the father has been unable to do so because of his probation orders.
Juan R., Sr., has not maintained any contact with his son. DCF has never received any card or letter or gift from the father to his son. DCF has never been contacted by the father in order to get in touch with the foster parents. The foster parents have never been contacted directly by CT Page 8267 the father as to the condition of his son. He has not seen his son since March, 1997.
The father did offer his mother as a placement resource and at one time, DCF's plan was to transfer guardianship to the paternal grandmother. A study was performed by F.A.S.U.[3] which concluded that Juan R., Sr., was doing very well, was going to rehabilitation for his drug use, and Juan R., Jr., would not be in any danger if he was placed with the paternal grandmother and the father in Puerto Rico. The mother was in favor of this permanency plan as late as March, 2000 when she told Social Worker Gibson that she would prefer Juan to go to his paternal grandmother's because it was hard for her to get everything together. (State's Exhibit I) However, the permanency plan of transfer of guardianship to the paternal grandmother was not approved by this court due to concerns that Juan would not be given the medical services he so needs as well as the concerns that the father had a severe substance abuse history as well as criminal history and would be residing in the home.
D. The child, Juan Luis R., Jr.
Juan R., Jr., was born in Puerto Rico on March 1996 and resided there until he came to Connecticut with his mother some time in the spring of 1997. When he was initially removed from his mother under the order of temporary custody issued on September 18, 1997, he was placed in the home of Mr. and Mrs. F., foster parents and has remained in their home ever since that date.
Juan was hospitalized in September, 1998, for treatment of a seizure disorder. It was at that time he was diagnosed as having Angelman's Syndrome, a neurological disorder associated with severe learning difficulties. Characteristics of Angelman's Syndrome include mental retardation, absence of speech, seizures, movement or balance disorder, and a happy, smiling behavior.
Mrs. F., Juan's current and only foster mother, is able to care for children with specialized needs or medically fragile. She has worked with adults with disabilities as has her husband who has worked in vocational settings and coaches Special Olympics. She described Juan's specialized needs. His seizures are controlled by medication so that he has a bad week about once a month. Although Juan is five years old, he doesn't speak, is not toilet trained, and although he has been able to walk since the age of three, cannot climb stairs. His food consists of finger foods, since he cannot maneuver forks and spoons, and has to watched at all times because he will eat garbage or anything he can get into his mouth. He pulls hairs and bites when he gets overly excited. Juan CT Page 8268 receives a myriad of special services, including birth to three services in the home, physical therapy and vocational therapy and is involved in multiple specialists.
The foster parents have encouraged Carmen to visit Juan in their home. But Carmen has visited there only a few times and calls maybe once a month. Mrs. F. last saw Carmen on February 2, 2001 at a visit in which the foster mother brought Juan to Carmen's house for a birthday party. Prior to that visit she saw Carmen in June of 2000 when the foster parents brought Juan to court and he visited with his mother on the steps of the courthouse.
Mr. and Mrs. F. are very willing to adopt Juan. Mrs. F. also would like to continue a relationship between Juan and his mother as she feels it is very important for him to maintain his biological ties and his cultural heritage. Juan is very bonded to her and her husband and has a very special relationship with Mrs. F.'s mother who is the only other person to care for Juan.
E. The mother's motion for Revocation of Commitment and Transfer ofGuardianship to Zoriada C., maternal grandmother
Zoraida C., first presented herself to the court as a possible placement resource in March, 2000, and expressed interest in caring for Juan. She lives in Hartford with the mother and her granddaughter, Marilyn, whom she has guardianship of through probate court. She lives in an apartment with two bedrooms.
Zoraida has some background in working with the elderly and disables, particularly patients with diagnosed with Alzheimer disease, but reports no formal medical training. She believes she can care for her grandchild even with his specialized needs because of her work with the sick and disabled.
After Zoraida expressed her interest in caring for Juan R., Jr., the court ordered that DCF investigate her as a placement resource. Gibson attempted to contact her and wrote her a letter requesting to contact DCF to set up a time to meet to discuss her needs. After a short time, Gibson heard from Zoraida who said she was interested but her work schedule was unpredictable and would need to get back to Gibson regarding visitation. Gibson went to the home and made efforts to try to get in touch with Zoraida, but to no avail. Since the filing of the motion to transfer guardianship, the maternal grandmother has never contacted DCF and has not offered any evidence that she was able to assume the guardianship of Juan. Further, Carmen had stated in the past that she did not want Juan to be with her mother due to her own troubled past relationship with her CT Page 8269 mother. Thus, DCF was not prepared to recommend Zoriada was a placement for Juan.
Although Zoriada stated she is aware of the extensive care Juan requires, she did not have an appropriate plan for the care of Juan. With her varying work schedule, she could not explain who would care for Juan or how she could support Juan. She would quit her job and do babysitting jobs in the house and care of Juan. She receives public assistance due to her care of Marilyn, however could not provide proof of that income.
This court cannot find her to be a suitable and worthy caretaker. Juan requires care 24 hours a day, 7 days a week, and she has not demonstrated that she can appropriately care for a child with his very specialized needs.
 II ADJUDICATION
A. Reasonable Reunification Efforts
The court must find that DCF has made reasonable efforts to reunify the child with the mother unless the court finds in that the parent if unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at hearing . . . that such efforts are not appropriate. General Statutes § 17a-112 (j)(1). The court found that reasonable efforts toward reunification were no longer appropriate as to both the mother and the father on June 20, 2000. (Keller, J.) The court does find, from the clear and convincing evidence, that reasonable reunification efforts had been made prior to the date of these findings.
B. Statutory Grounds
Each statutory basis set out in General Statutes § 17a-112 (b) is an independent ground for termination. In re Baby Girl B., 224 Conn. 263,618 A.2d 1 (1992). The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence.
1. Abandonment — General Statutes Section 17a-112 (c)(A)
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. Sporadic efforts are insufficient to negate the claim of abandonment. The test for determining abandonment of a child for purposes CT Page 8270 of termination of parental rights is not whether a parent has shown "some interest" in his or her child, but rather, whether the parent has maintained any reasonable degree of interest, concern, or responsibility as to the child's welfare. In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987).
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M., 6 Conn. App. 194, 209,504 A.2d 533 (1986). From the child's date of placement the mother has failed to maintain consistent visits or to have any regular, meaningful personal interaction with the Juan. For the past year, she has seen Juan on two occasions — and only one in which she initiated four days prior to the trial as a possible last ditch effort. She did not send cards or gift or provide any type of financial support. Her phone calls to the foster family were sporadic although they welcomed and encouraged her contact. The father has had no contact with his son in over four years and has not attempted to inquire about his well being in those years.
 The commonly understood general obligations of parenthood entail these minium attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted. In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993); In re Roshawn R., 51 Conn. App. 44, 53, 720 A.2d 1112
(1998).
Statutory abandonment on the part of Carmen and Juan R., Sr., has been proven by clear and convincing evidence. Each has failed to display the minimal attribute of parental obligation. Neither has manifested a consistent, prolonged and reasonable degree of affection, interest, concern or responsibility as to their child's welfare. In re Rayna M.,13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); In re Michael M.,29 Conn. App. 112, 121-123, 614 A.2d 832 (1992).
2. Failure to Rehabilitate — General Statutes § 17a-112 (c)(B)
Juan was adjudicated neglected both in 1998 and 1999 and committed to the care and custody of DCF. The court further finds, by clear and convincing evidence, that as of January 11, 2001, Carmen had not achieved such a degree of personal rehabilitation as would encourage the belief CT Page 8271 that within a reasonable time, considering the age and needs of her child, she could assume a responsible position in his life. Conn. Gen. Stat. § 17a-112 (j)(3)(B). She did not participate in the services offered to her.
She had minimal compliance with her court ordered steps toward reunification. She failed to attend the administrative case reviews. She did not keep her whereabouts to DCF known at all times. She did not complete her individual counseling nor did she successfully complete a substance abuse treatment program. Although she was permitted to visit with her son on a weekly basis, she failed to do so. Carmen was referred to a reunification program and she failed to attend on a regular basis and to participate in the program. The prognosis from the provider was that Carmen was not capable of caring for her child and recommended that the mother should not be reunified with her child.
Personal rehabilitation, as used in the statute, refers to the restoration of a respondent to a constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986). The parent's compliance with expectations set after the adjudication of the neglect or uncared for case or the parent's success in fulfilling service agreements entered into with DCF are relevant, but not dispositive, to the rehabilitation finding. In re Luis C., 210 Conn. 157, 167-168,5545 A.2d 722 (1989). The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parents than he or she was at the time of the commitment. In re Michael M., 29 Conn. App. 112, 126, 614 A.2d 832
(1992).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. Inre Luis C., supra, 210 Conn. 167. The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. In re Davon M., 16 Conn. App. 693, 696, 548 A.2d 1350
(1988). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M., 19 Conn. App. 371, 377, 562 A.2d 566 (1989).
Because of the requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only Carmen's conduct prior to the filing of the petition, but also her conduct after that time. The only indication that Carmen may assume the responsibility as a parent was her completion of the Family Life Education program in June, 2000. But after that date she provided the court with no further efforts of her engaging in any CT Page 8272 services to enable her to reunite with her son or to assume her role as a parent. In fact, she tacitly admitted her inability to assume such a role by continually supporting DCF's plan to transfer guardianship, first to the paternal grandmother and then by her own motion to her mother. Given Juan's age and needs, the court cannot support allowance of any further time for Carmen's rehabilitation.
3. No Ongoing Parent-Child Relationship — General Statutes §17a-112 (c)(D)
This ground alleged by the petitioner requires proof, by clear and convincing evidence, that there is no ongoing parent-child relationship, which means "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
This statutory definition, as it has been interpreted in case law, requires a finding that "no positive emotional aspects of the relationship survive." In re Jessica M., 217 Conn. 459, 470, 586 A.2d 597
(1991). It "is inherently ambiguous when applied to noncustodial parents who must maintain their relationship with their children through visitation." Id., 459; In re Valerie D., 223 Conn. 492, 531, 613 A.2d 748
(1992). Although the ultimate question is usually whether the child has no present memories or feelings for the natural parent, the existence of a loving relationship or a "psychological parent" relationship with one other than the natural parent does not, of itself, establish the no ongoing parent-child relationship ground for termination. In re JessicaM., supra, 473-475.
To establish this ground requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists; and second, the court must look to the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. The absence of a parent-child relationship can be demonstrated in situations where a child has never known his or her parents so that no relationship ever developed between them, or where the child has lost that relationship so that despite its former existence, it has now been completely displaced. In reJuvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875 (1979).
Juan has not seen his son since March, 1997. He has not been involved in his son's life, he has not called to inquire about him, not sent cards, letters or gifts. He has failed to display or express any love or affection, clear and convincing evidence or his lack of interest in the CT Page 8273 child. Juan R., Jr., has no present memories of the father he has not seen in over four years. He has no connection or bond with his biological father and would not recognize him as his parent or go to him to have his needs met. The court finds from the uncontradicted clear and convincing evidence that Juan R., Sr., has no ongoing parent-child relationship with his son.
 III DISPOSITION
A. General Statutes § 17a-112 (e) Criteria
The court has found by clear and convincing evidence that all of the statutory grounds alleged by the petitioner for the termination of Carmen C. and Juan R.'s parental rights have been proven. Before making a decision whether or not to terminate respondents' parental rights, the court must now consider and make findings on each of the seven criteria set forth General Statutes § 17a-112 (e). In re Romance M.,229 Conn. 345, 355, 641 A.2d 378 (1994).
1. (Finding regarding the timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.)
Appropriate and timely services were provided by the Department of Children and Families including counseling, case management, transportation assistance, and visitation coordination to the mother. These include services to benefit Juan as well as referrals for Carmen to deal with issues of parenting and substance abuse. DCF also provided visitation coordination and case management services to the mother. She was referred on several occasions for substance abuse treatment to the Institute for Hispanic Families as well as the Institute of Living. She was referred for individual therapy as well as the reunification program at Catholic Family Services. The services were appropriate and offered on a timely basis.
The father was not provided with any services since he failed to appear for any of the court hearings and contacted DCF on only one occasion.
2. (Finding regarding whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended.)
As previously noted, the court finds reasonable reunification efforts were made by DCF and that the parents were unable to benefit from then. CT Page 8274 In addition, the court found on June 20, 2000 that further efforts for reunification were not appropriate.
3. (Finding regarding the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.)
Regarding any court orders, fulfillment of obligations, expectation and services agreements, DCF, with the approval of the court, set reasonable and realistic expectations to reunify the family. The court issued court expectations on August 16, 1999 to the mother. The court finds that reasonable court expectations were set for Carmen in the neglect proceeding and that she was minimally able to fulfill them. The father was never given court ordered expectations due to his failure to appear at any court hearing.
4. (Finding regarding the feelings and emotional ties of the child with respect to his/her parents, any guardian of his/her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.)
Juan R., Jr., has been in the same foster home for almost four years. He is clearly bonded to his foster family, not only his foster parents, but his extended foster family. Although Carmen provided the court with pictures of a smiling Juan at her only visit in almost one year, the court takes into account Juan's most rare condition whose characteristic it is that he smiles almost all the time and appears to be happy. The court finds to extent he is able that Juan has significant feelings and emotional ties to his foster family.
5. (Finding regarding the age of the child.)
Juan R., Jr., is now five years old.
6. (Finding regarding the efforts the parent has made to adjust his/her circumstances, conduct, or conditions to make it in the best interest of the child to return him/her to his/her home in the foreseeable future, including, but not limited to: (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.) CT Page 8275
As detailed above, the court finds that the mother has not made the significant changes in her life to accommodate the care and nurturing of this child. Out of 80 possible visits, 15 were made.
7. (Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
There is no evidence that the unreasonable act or conduct of DCF personnel or any other person prevented the respondent the father and the mother from maintaining a meaningful relationship with their children. There is no evidence that the parents' economic circumstances prevented a meaningful relationship from being maintained. In fact, the petitioner has encouraged the parents to maintain a meaningful relationship with their children.
B. Best Interests of the Child
The court has found that the grounds for termination of the parental rights of the biological mother and the father have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in this child's best interests. The court must now address the issue of whether the termination of parental rights is in the best interests of the child. This is part of the dispositional phase of a termination proceeding.
The court must also consider his best interests as to the issues raised by the motion to revoke commitment and transfer guardianship to maternal grandmother. As has been held:
"The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests." In re Cesar G., 56 Conn. App. 289, 292-293, 742 A.2d 428
(2000).
At this time there is no doubt that the cause for the commitment continues to exist. Juan has very specialized needs which require attention as the foster mother testified "24/7". There is no evidence to indicate that Carmen is able to care for her child given his rare condition. Moreover, she has consistently been in favor of a transfer of guardianship to either the paternal grandmother and now the maternal grandmother, recognizing that she cannot care for his son. Therefore, the CT Page 8276 court denies the motion for revocation of commitment.
Having denied the motion, the court must next consider the motion for transfer of guardianship. The motion to transfer guardianship was filed by the mother August 22, 2000. However it was not until March, 2001, that the maternal grandmother ever appeared in court or made herself known to DCF. And then, even after she appeared in court and the court ordered that DCF investigate her as a placement resource, she did not diligently pursue the placement. The court finds from the clear and convincing evidence that she does not have a close relationship with Juan and does not fully appreciate the severity of his condition and the care he will require. The court finds that she is not a suitable and worthy person to have guardianship of him. The court therefore denies the motion for transfer of custody and guardianship to her.
Next, the court must examine whether it is in the best interests of the child to terminate his parents' rights to them. The court finds that neither Is in the a position to care for I in the near future. The foster mother is the person to whom he is attached and given his special needs, he should not be moved again and required to form new attachments. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of I to have permanency and stability in his life and that it is in his best interests that his parents' right to him be terminated.
It is further ordered that the Commissioner of Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child. The foster parents have expressed a desire to adopt Juan and the court directs that they be given first consideration in any adoption. The Commissioner shall file with the court, no later than thirty (30) days following the date of judgement, a written report toward such permanent placement and file such further reports as are required by state and federal law.
SWIENTON, J.